# Court of Appeals
## Tenth Appellate District of Texas

---

10-25-00047-CV

---

In the Interest of A.K., E.K., E.K., J.K., D.K., and D.K., Children

---

On appeal from the
82nd District Court of Robertson County, Texas
Judge Bryan F. Russ, Jr., presiding
Trial Court Cause No. 24-05-21858-CV

---

CHIEF JUSTICE JOHNSON delivered the opinion of the Court.

## MEMORANDUM OPINION

Following a bench trial, the parental rights of the father of A.K., E.K., E.K., J.K., D.K., and D.K. (Father) were terminated.[1] The trial court found by clear and convincing evidence that Father had violated Family Code subsections 161.001(b)(1)(D) and (E) and that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b). In two issues, Father contends that the evidence was legally and factually insufficient to support the trial court's termination findings. We will affirm.

---

[1] Following a jury trial, the parental rights of the mother of A.K., E.K., E.K., J.K., D.K., and D.K. (Mother) were also terminated, but she has not appealed.

The standards of review for legal and factual sufficiency of the evidence in cases involving the termination of parental rights are well established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). In a bench trial, the trial court, as factfinder, is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Family Code, the Department of Family and Protective Services (the Department) must establish by clear and convincing evidence two elements: (1) that the respondent parent committed one or more acts or omissions enumerated under subsection (b)(1), termed a predicate violation, and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *In re J.F.-G.*, 612 S.W.3d 373, 381 (Tex. App.—Waco 2020) (mem. op.), *aff'd*, 627 S.W.3d 304 (Tex. 2021). Proof of one element does not relieve the petitioner of the burden of proving the other. *J.F.-G.*, 612 S.W.3d at 381.

PREDICATE VIOLATIONS

Father first contends that the evidence was insufficient to support the trial court's findings that he violated Family Code subsections 161.001(b)(1)(D)

and (E).[2] We begin with Father's argument that the evidence was insufficient to support the trial court's finding that he violated subsection (E).

Termination under subsection (E) requires clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). To "endanger" means to expose the child to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The relevant inquiry under subsection (E) is whether sufficient evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied).

Scienter is not required for a parent's own acts to constitute endangerment under subsection (E). *See In re L.S.*, No. 10-22-00119-CV, 2022 WL 3655395, at *2 (Tex. App.—Waco Aug. 24, 2022, no pet.) (mem. op.). It is also not necessary to show that the parent's conduct was directed at the child or that the child suffered actual injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from the parent's misconduct

---

[2] In the statement of his issues in his initial appellant's brief and then again in his reply brief, Father additionally asserts that the evidence was insufficient to support a finding by the trial court that he violated Family Code subsection 161.001(b)(1)(O); however, the trial court did not find that Father violated subsection (O). Accordingly, we need not address this contention by Father.

alone. *Id.* Furthermore, we may consider conduct both before and after the child's removal in an analysis under subsection (E). *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The relevant evidence presented here was as follows: Father and Mother married in 2010, and although Father testified that he did not intend to remain married to Mother, they were still married at the time of trial in November 2024. At the time of trial, their daughters A.K. and D.K. were thirteen and six years old, respectively, while their sons E.K., E.K., J.K., and D.K. were twelve, eleven, ten, and seven years old, respectively. Mother testified that the family's first interaction with the Department was around March 2024, after A.K. had run away from the family's apartment home in Hearne. A.K. was found at a McDonald's and taken to the police department. A police officer and someone from the Department returned A.K. home. Mother testified that A.K. denied any abuse at that time. A.K. then ran away from home a second time. She was later found at a gas station and returned home by the police. Mother stated that the Department closed its case at that time but provided her information about a program and therapy services for A.K. Mother did not utilize those resources, however, because she could not afford them.

Lidia Chandler Davis testified that she was then called to a certain restaurant in Hearne at about 7:45 a.m. on May 9, 2024, after the junior high principal had seen A.K. there. Davis was employed by Hearne ISD at the time

and had been A.K.'s academic adviser when A.K. had been enrolled in school there for about a week. Mother testified that she had enrolled the children in school at Hearne ISD but that the children had only stayed there for about a week because she did not like the school system. Mother thereafter homeschooled all the children.

Davis testified that she arrived at the restaurant and talked with A.K. A.K. was "cold, dirty, bruised, and hungry" and appeared scared. Davis bought A.K. five tacos, and she ate them all. Davis believed that A.K. needed help; therefore, she drove A.K. to the HealthPoint clinic where A.K. was assessed.

Ashley Richardson, a family nurse practitioner at Hearne HealthPoint, testified that it was her understanding that when school personnel brought A.K. into the clinic on May 9, 2024, A.K. had been found walking or running down the street. A.K. arrived at the clinic not wearing any shoes, but she was wearing a trench coat and a beanie despite it being summertime. A.K. was cold and trembling and would not make eye contact. Richardson opined that A.K. did not look like a thirteen-year-old girl. Due to abuse concerns, Richardson examined A.K.

Richardson testified that on the way back to the examination room, they paused to determine A.K.'s height and weight. At that time, A.K. weighed in at only sixty-three pounds. Richardson noted at trial that she remembered that number because her own seven-year-old daughter weighed sixty-seven

pounds at that time. Richardson explained that the typical weight for a thirteen-year-old female is about one hundred pounds. Richardson continued that even the fifth percentile for weight for a thirteen-year-old female is about seventy-six to eighty pounds; therefore, A.K. was underweight. Richardson further noted that A.K. was short but that, even considering A.K.'s short stature, A.K. was underweight because a body mass index (BMI) that is below 18.0 is considered underweight, and A.K.'s BMI was 13.5. Richardson additionally recounted that A.K. was eating when she arrived at the clinic, and Richardson kept having to tell A.K. that she needed to slow down, or she would throw up. A.K. told Richardson that she had not eaten since Tuesday.[3] A.K. also kept saying, "Secret stash. Secret stash." When Richardson questioned A.K. about what she meant, A.K. asked Richardson if she had a secret stash of hidden food.

Richardson testified that she then performed a head-to-toe assessment of A.K. As she began her evaluation, the first thing that struck Richardson was that A.K. had periorbital ecchymosis or "raccoon eyes." Richardson explained that raccoon eyes are typically the result of a lack of sleep. Once A.K.'s beanie was removed, Richardson then noticed blood and a patch of hair missing from A.K.'s scalp. Richardson asked A.K. what had happened, and

---

[3] May 9, 2024, was a Thursday.

A.K. responded that she had flipped her hair, which Mother "looked at to be sexual in front of [Father]," so Mother had "ripped her dreads out." Richardson also observed bruising underneath A.K.'s left eye and scabbing of an abrasion above her left eyebrow. When Richardson asked A.K. what had happened there, A.K. responded that she was "getting a whooping" from Mother with a belt when she tried to run but stumbled and hit the dresser. Richardson additionally noted that A.K.'s left ear was full of dried blood. When she asked A.K. what had happened there, A.K. responded, "Momma stuck something in my ear."

Richardson then testified that as she pulled up the long, dingy white shirt that A.K. was wearing, A.K. stated that she had not been allowed to go to the restroom. A.K. said, "Well, they had me locked from the inside, so I just had to pee. Whatever I needed to do, I had to do in the room." Richardson stated that A.K. had different types of healing bruising on her upper chest cavity and arms. A.K. explained to Richardson that those were additional injuries from falling and hitting the dresser. Richardson then noted that A.K. was very bony. Richardson observed that A.K.'s abdomen was "kind of caved in" and that you could see her ribs. Richardson also observed desquamation or shedding of the skin all the way down A.K.'s legs. Richardson explained that skin shedding is usually the result of dehydration or malnourishment.

Richardson testified that A.K. also had abrasions on her knees. When Richardson asked A.K. what had happened there, A.K. explained that she had received the abrasions when she was coming down from the second floor of the building to get away. Richardson observed at that point that A.K. also had "tight markings" on her wrists where something had been tight on her arms. Richardson observed the same marks around A.K.'s ankles. A.K. told Richardson that she had been tied up in a bedroom. Richardson asked A.K. if she had been sexually abused in any way, and A.K. replied, "No. They only hit me." Richardson therefore determined, based on her examination of A.K., that A.K. had been physically, emotionally, and psychologically abused.

Melanie Shiminski, a forensic nurse at Baylor Scott & White in College Station, testified that she also assessed A.K. on May 9, 2024, when A.K. was brought into the emergency room. Shiminski noted that when she first encountered A.K., A.K. appeared disheveled and extremely malnourished with poor dress and hygiene. A.K. had a quiet demeanor and did not maintain eye contact. A.K. also flinched when Shiminski made any sudden movements toward her. Shiminski further observed that A.K. smelled like she had not showered in some time, which A.K. confirmed to her. A.K. also reported to Shiminski that she had urinated on herself the day before because she had been unable to hold it. A.K. reported to Shiminski that she had been having trouble falling asleep and that it had been "a while" since she had had proper

sleep. Shiminski stated that this was supported by the darkness around A.K.'s eyes and the fact that her eyes were sunken in. When Shiminski then asked A.K. about her eating habits, A.K. stated, "I eat, but [Mother] makes me work for it." A.K. discussed with Shiminski how she had to do chores to get food.

Shiminski then testified that A.K. reported that she was afraid of Mother. A.K. reported to Shiminski that some months before, she had been threatened by a gun but stated that she did not know if the gun was loaded. A.K. also described to Shiminski an incident where Mother punched her in the stomach because Mother got mad at her for asking a question. A.K. then talked to Shiminski about being abused by Mother by being hit with a belt on her face and her body. Additionally, A.K. described an incident from about two weeks before Shiminski's evaluation of her when Mother was mad at A.K. and "shoved something from her makeup stuff" into A.K.'s ear. A.K. reported to Shiminski that her ear had been bleeding ever since. When Shiminski then asked A.K. if, in addition to the actual abuse committed, there had also been threats of harm, A.K. said that Mother told her that she wished her dead. A.K. further reported that she had had thoughts of suicide but that she had never acted on those thoughts.

Shiminski testified that A.K. then reported that the night before, she and Mother had had a disagreement and that Mother "kind of went overboard." A.K. explained that Mother pulled her hair and then choked her and lifted her

up off the ground with her hand to the point that A.K. could not breathe, had blurry vision, and felt dizzy. A.K. stated that Mother finally released her just when A.K. was about to pass out. A.K. reported that Mother then dragged her to a bedroom, tied her arms behind her back, tied her feet together, and left her lying on her stomach on the floor all night. A.K. stated that in the morning, she had been able to untie herself and had escaped through the window. At that point, Shiminski asked A.K. if anything like that had happened before. A.K. reported that Mother had tied her up on three previous occasions. When Shiminski asked A.K. if Father had also been involved in the physical abuse, A.K. replied, "My dad would do the same things when he's really, really mad; but he usually doesn't do much."

Shiminski then testified that A.K. "had a significant amount of injuries to her body." Some of the injuries appeared to be more recent while others had healed and scarred. A.K. explained that the healed scarring that she had all over her body, including on her face, were from previous instances of Mother hitting her with a belt. When Shiminski asked A.K. about two specific healed scars on her hand, A.K. stated that she did not really want to talk about it but noted that "it bled a lot when it happened." Shiminski further noted that A.K. had multiple areas with carpet burn-type injuries. A.K. explained to Shiminski that she had received those injuries from being dragged. Shiminski then noted that A.K. had markings on her wrist, which A.K. reported were

where she had had her hands tied with the belt. Shiminski also noted that the skin on A.K.'s legs was extremely dry and flaking and had multiple small pinpoint lesions going down them. A.K. reported that that was because she had not "been able to take a good bath in about two weeks" and because Mother did not let her use the soap.

Shiminski then finally testified that there was no medical reason that she could ascertain for the general condition of A.K.'s body. Shiminski also stated that she did not believe that any of A.K.'s injuries were self-inflicted. When asked at trial if, based on her evaluation of A.K., Shiminski had determined whether A.K. had experienced abuse or neglect, Shiminski replied that she had made a determination. When asked what her determination was, Shiminski stated:

> Based on what I saw, it was obvious that she had, you know, injury
> - - significant amount of injury over her body. That would not be
> normal for an average 13-year-old. As well as her body - - she was
> extremely malnourished. And you could tell that just the size and
> physical appearance of her body is not the normal appearance of a
> normal 13-year-old healthy child.

Gabriel Milam, the Department's primary caseworker assigned to this case, testified that all six of Mother's and Father's children were thereafter removed from their care. All six children were found to be "medically significantly malnourished." All six children were also able to provide eyewitness accounts of the "discipline" that A.K. was receiving, which

"absolutely" amounted to emotional abuse of the children. There were also reports that all five of the younger children were trained to participate in "disciplining" A.K.

In her testimony, Mother admitted to participating in some of the conduct that A.K. described to Richardson and Shiminski. Mother admitted to grabbing A.K. by the hair and to hitting A.K. in the stomach. Mother acknowledged that the injury around A.K.'s eye occurred when A.K. was getting a spanking. Mother stated that A.K. had "hit the floor" after A.K. was "wiggling and moving around." Mother also admitted to choking A.K. and to putting her hands around A.K.'s throat. Mother explained that she and A.K. were arguing because A.K. "wants to be part of the family and she's sorry for what she was doing, and I didn't want to hear it." A.K. then bit Mother, and in response, Mother "put [her] hand around [A.K.'s] neck and . . . got her down to the ground." Mother denied that it hurt A.K., stating, "I didn't stay there long enough for it to hurt her." Mother nevertheless admitted that she knew that it was inappropriate discipline and was a situation that endangered the health or well-being of A.K. Additionally, Mother admitted that she owned a gun that she kept in the home, but she denied ever displaying the gun to A.K.

Mother also testified that about a month before the children were removed, Father had caught A.K. trying to sneak out of the house. By that time, A.K. had already run away from home twice before; therefore, Mother

and Father decided to do something more to try to keep A.K. in the home. Mother stated that it was Father's idea to restrain A.K. by tying her in her room so that she would stop running away, and Mother thought that that was a good idea. Mother thereafter "locked [A.K.] in her room with a cord that goes from the vacuum cleaner." Mother also tied A.K.'s hands together with a belt. Mother admitted that she restrained A.K. in this manner on four different occasions. When asked if she was aware that the restraints had caused bruising to A.K.'s wrists, Mother replied that A.K. had caused the bruising to herself because she was trying to get out of the restraints. Mother further noted that she told Father that A.K. was causing bruising to her wrists and that both she and Father participated in restraining A.K.

Mother testified that during this time, A.K. was allowed to use the bathroom and to take a shower whenever she wished but that Mother would escort her to do so. When A.K. needed to go to the bathroom, she would "yell out." Mother would then untwine the cord from the vacuum cleaner and open the door to the room in which A.K. had been locked. Mother would then make sure that A.K. was not bringing anything into the bathroom with her before closing the bathroom door. Once A.K. was done, Mother would take A.K. back to the room. Mother testified that A.K. was getting mad because she could not go to the bathroom on her own, so she started purposely urinating in her clothes. Mother stated that A.K. would then take other clothes and clean up

the mess, so she would not get caught. Mother said that she had to throw away A.K.'s clothes because they had been sitting in the back of Father's vehicle and smelled like urine.

Mother testified that A.K. was also initially allowed to come out of the room to do chores and to participate in what the rest of the family was doing. Mother acknowledged that she then began excluding A.K. from family activities. When asked what kind of activities A.K. was excluded from, Mother replied that A.K. "liked learning a lot. . . . So because I knew that she liked it, that's something that I took away." Mother further explained that A.K. was running away so often because she could not get what she wanted. When asked what A.K. wanted, Mother stated that A.K. "wanted to be part of her other siblings and doing and participating in things that they was [*sic*] doing."

Mother testified that in addition to running away, A.K. was also disciplined because she "had been stealing for a long time." Mother described an incident where she had to take A.K. out of school because A.K.'s teacher had seen A.K. "stealing all the kids' snacks" in the classroom. Mother also stated that A.K. would put things in her pocket at the grocery store. When Mother was then asked if she had told anyone that she had to use handcuffs on A.K. because A.K. had stolen food out of the refrigerator after not being fed for two days, Mother replied, "Yes. I handcuffed her because I told her this is how it feels when you sit there and steal, and you keep on stealing." Mother

additionally stated that she told a Department investigator that she had taken away A.K.'s meals because A.K. "was taking the food that was supposed to be for me." Mother explained that she had not eaten in days, and A.K. "was in there taking my food. So because she ate, and ate mine, then her food was withheld." Mother also admitted that A.K. was digging food out of the trashcan, and Mother acknowledged that A.K. got in trouble on one occasion for stealing a piece of bread and cheese. Mother explained that the bread had been found underneath the couch and had been there for a couple of days but that the youngest child came and told Mother that A.K. was in the refrigerator trying to take the cheese. Mother stated that A.K. was thereafter disciplined by being locked in her room.

Mother testified that she taught the other children to watch A.K. to make sure that A.K. was not doing anything that she was not supposed to be doing. Mother further acknowledged that she had shown the other children how to lock A.K. in her room with the vacuum cord. Mother stated that the other children also witnessed A.K. getting a spanking with a belt. Mother said that this happened "twice a week; that's if I even felt like talking to her." Mother additionally testified that the other children did not want to be around A.K. The other children talked about how badly A.K. smelled. The other children, mainly the oldest son, referred to A.K. as "trash." The other children also called A.K. "dumb-dumb," "nasty," "ugly," and "lizard feet."

Mother testified that because of all the problems with A.K., she and Father had discussed possibly sending A.K. with Father on the road while he was truck driving for work. Mother stated that Father thought that that would be the best thing for A.K., but Mother was not in favor of it and did not agree to it. Mother testified that she kept A.K. away from Father because he "would listen to her side of the story." Mother further admitted that she did not tell Father about punching A.K. in the stomach or putting her hand around A.K.'s throat and putting her on the ground. Father later confirmed in his testimony that he did not know that Mother had punched or choked A.K. Father additionally stated that he thought that A.K. herself never told him what was truly going on when he was away at work or out of the house because A.K. was afraid of how Mother would react. Father described an incident where Mother told him that A.K. was acting inappropriately with him, but he believes that A.K. "had been trying to run up under [him] as a shield" for protection and that Mother did not want him shielding her.

However, Father also testified that he knew that A.K. was being physically restrained. Father testified that he did not like Mother locking A.K. in her room and binding her hands and feet and that he and Mother "would argue and fight about it." But Father admitted at trial that he did nothing to stop it.

Father testified that, contrary to Mother's testimony, it was not his idea to physically restrain A.K. but that, about a week or two before the children were removed, Mother told him over the phone about physically restraining A.K. Father explained that he was driving a truck for work at that time. The plant for which he drove was located about fifteen minutes from his home, and he would drive a truck back and forth about an hour and a half from the plant. Father acknowledged at trial that he was also aware that Mother was escorting A.K. to the bathroom for urination, defecation, and showering. Father further admitted that Mother told him that the other children were being taught how to secure the room so that A.K. could not get out, and he admitted that he had heard the other children calling A.K. nicknames. Father additionally testified that he believed that the other children had witnessed Mother's abuse of A.K., and he admitted that it endangered the children. Father ultimately acknowledged at trial that he had "failed as a father."

Father testified that he last saw A.K. the day before she snuck out in May 2024. Father admitted that in the photos of A.K. at the time of removal in May 2024, A.K. did not look like a thirteen-year-old who was safe and well taken care of. When asked if he was not concerned about how small and thin A.K. was at that time, Father replied:

> I was a little. But, like [Mother] said, we was [*sic*] going through a rough patch at the time and all of us were struggling. My wife and I, we both skipped meals in order to make sure [the children]

had something to eat. So, in my opinion, we were all a little underweight.

Father nevertheless acknowledged that when Mother went to have a psychological, she had admitted to drinking at least a beer a day for the last five years and that her drinking had increased in the two months before the children were removed. Father stated that, in his opinion, Mother was drinking a lot at that time. Father also acknowledged that Mother smoked. Father therefore admitted that while they were missing meals because he and Mother did not have enough food for themselves and the children, Mother was spending money on alcohol and tobacco for herself. Father then further admitted that he had also spent money on alcohol and tobacco for himself during this time. And Father acknowledged that this endangered the children.

Father argues that the evidence is insufficient to show that he engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered their physical or emotional well-being because the evidence shows that he was not directly involved in the abuse of the children and was not aware of Mother's abuse of the children until a week or two before the children were removed. However, in his own testimony, Father admitted that when he was made aware of Mother's abuse of the children, he did nothing to stop it. He stated only that he argued and fought with Mother about it. *See E.M.*, 494 S.W.3d at 222 (stating that parent may violate subsection (E)

through conduct including acts as well as omissions or failures to act). Furthermore, the evidence, as outlined above, indicates that Father not only failed to act but that, at times, he participated in acts that endangered the physical or emotional well-being of the children. During the forensic nurse's assessment of A.K., A.K. told her that Father physically abused her when he was "really, really mad." Mother also testified that both she and Father participated in the restraining of A.K. And Father admitted in his own testimony that he had spent money on alcohol and tobacco for himself when his children did not have enough food to eat.

Considering all the evidence presented in this case in the light most favorable to the trial court's finding and considering the evidence as a whole, we conclude that the evidence was legally and factually sufficient to establish that Father engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

Father points out that the trial court's written findings of fact include that he "plead[ed] guilty in Cause# 24-07-22260-CR in the 82nd District Court for Robertson County, Texas on December 11, 2024 to the charge of Injury to a Child, Elderly or Disabled Individual and was placed on 10 years Deferred Adjudication" and "plead[ed] guilty in Cause# 24-07-22260-CR in the 82nd District Court for Robertson County, Texas on December 11, 2024 to the charge of Abandoning a Child and was placed on 10 years Deferred Adjudication."

Father argues that the trial court improperly relied on such evidence to support its termination findings because the record was closed on November 21, 2024. But even if the trial court erred in considering such evidence, the error was harmless. *See* TEX. R. APP. P. 44.1(a)(1). Even without considering the complained-of evidence, the overwhelming evidence, as outlined above, supports the trial court's finding that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Thus, we cannot conclude that such alleged error caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *New Process Steel, L.P. v. Sharp Freight Sys., Inc.*, No. 01-04-00764-CV, 2006 WL 947764, at *4 (Tex. App.—Houston [1st Dist.] Apr. 13, 2006, no pet.) (mem. op.) ("While an erroneous finding of fact on an ultimate fact issue is harmful error, an immaterial finding of fact is harmless and not grounds for reversal.").

Moreover, having concluded that the evidence was legally and factually sufficient to support the trial court's finding that Father violated subsection (E), we need not address Father's argument that the evidence was legally and factually insufficient to support the trial court's finding that he violated subsection (D). *See In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam).

BEST INTEREST OF THE CHILDREN

Father next contends that the evidence was insufficient to support the trial court's finding that termination was in the best interest of the children.

In determining the best interest of a child, several factors have been consistently considered, which were set out in the Texas Supreme Court's opinion of *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* This list is not exhaustive but simply identifies factors that have been or could be pertinent in the best-interest determination. *Id.* at 372. There is no requirement that all these factors be proven as a condition precedent to parental termination. *See C.H.*, 89 S.W.3d at 27. The absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the child's best interest. *Id.* In fact, while no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in

the child's best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). And evidence relating to the predicate grounds under subsection 161.001(b)(1) may be relevant to determining the best interest of the child. *See C.H.*, 89 S.W.3d at 28.

As stated above, at the time of trial, A.K. E.K., E.K., J.K., D.K., and D.K. were thirteen, twelve, eleven, ten, seven, and six years old, respectively. None of the children testified, but Department caseworker Gabriel Milam testified that although the children had expressed a desire to speak with their parents, the children had requested to stay at their current placement.

Regarding the emotional and physical needs of the children now and in the future, the need for permanence is the paramount consideration. *In re A.R.C.*, 551 S.W.3d 221, 227 (Tex. App.—El Paso 2018, no pet.); *Dupree*, 907 S.W.2d at 87. A parent's incarceration is relevant to his ability to meet the children's present and future physical and emotional needs. *A.R.C.*, 551 S.W.3d at 227. A parent's incarceration at the time of trial makes the children's future uncertain. *Id.* Here, Milam testified that the children could not be returned to Father at the time of trial because Father was currently incarcerated.

Regarding the emotional and physical danger to the children now and in the future, evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5–6 (Tex. App.—Corpus Christi–Edinburg Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). We already discussed above that the evidence, as outlined above, indicates that Father not only failed to act but that he participated at times in acts that endangered the physical or emotional well-being of the children.

Regarding the plans for the children by the individuals or agency seeking custody and the stability of the home or proposed placement, the factfinder may compare the parent's and the Department's plans for the child and consider "whether the plans and expectations of each party are realistic or weak and ill-defined." *In re J.D.*, 436 S.W.3d 105, 119–20 (Tex. App.—Houston [14th Dist.] 2014, no pet.). A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder "to determine that [the] pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23,

2004, no pet.) (mem. op.). A factfinder may also consider the consequences of its failure to terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur. *In re B.H.R.*, 535 S.W.3d 114, 124 (Tex. App.—Texarkana 2017, no pet.). The goal of establishing a stable, permanent home for a child is a compelling state interest. *Dupree*, 907 S.W.2d at 87.

Mother testified that she, Father, and the children had "moved around a lot" over the years. Around the time that A.K. was born, they lived in an apartment in Ocworth, Georgia. After living there about a year, they moved to an extended stay motel "because of income." When their second child was born, Mother and Father were then living in a home in Biloxi, Mississippi. When their third child was born, Mother and Father had then moved to Cartersville, Georgia. Around that time, Father was "starting to become a truck driver" and "was the main one that was working."

Mother testified that they then ended up moving back to Mississippi where their fourth child was born. When asked how many different places they lived in Mississippi during that time, Mother replied, "I'm not sure." When asked if it was more than one place, Mother said, "Most likely." Mother testified that they had then moved back to Georgia by the time that their fifth child was born. Mother then acknowledged that they were homeless three

times after their last child was born. Mother testified that during those times Father "was in between little jobs, like, working at the temp services." During those times, they lived in their vehicle or stayed in homeless shelters.

Mother testified that the family moved to Texas around 2016 or 2017. The family moved to Texas for Father to work in the oil industry. They were then living at a motel in Bryan, and Father was making about $1,700 per week. The family then moved to a home in Killeen where they stayed for three years. At that time, Father stopped working in the oilfield and began working for a cement company. Father worked for the cement company for years, off and on. Mother testified that after COVID-19 happened, however, they moved back to the motel in Bryan where Father worked for a trucking company. They then moved to a manufactured home in Elmendorf for less than a year and then back to the motel in Bryan. Eventually, they moved to Hearne and had been living in the apartment there for about seven months when the children were removed.

Father confirmed Mother's testimony about the number of times that they moved and the struggles that he had with providing for the family. Father admitted that the children were struggling and that it was not good for them to be living in a vehicle. Furthermore, Mother testified that Father had attempted suicide around 2020 because she had been talking about divorce. Mother stated that on the night of the incident, she left the children in the

vehicle while she went inside and found Father in the bathtub with a knife in his hand, threatening to take his own life. Mother said that she stayed with Father for about an hour that night while the children stayed in the vehicle. Mother testified that Father also made a second attempt to commit suicide while they were living in Killeen by overdosing on sleeping pills. When asked why Father was so distraught that he was trying to commit suicide, Mother replied that Father was "[j]ust dealing with life." Mother said that Father was just overwhelmed with everything, including dealing with six children, trying to stay up on the bills, and helping her around the house. Mother stated that Father was not getting any counseling, however. When asked why, Mother replied, "Just dealing with it on our own." As stated above, Milam also testified that the children could not be returned to Father at the time of trial because Father was currently incarcerated.

On the other hand, Milam testified that the children were doing "[f]abulously" and "absolutely thriving" in their current placement. Milam stated:

> [The children] are healthy, up-to-date on all medical, dental appointments. They receive weekly individual therapy. They are involved in numerous extracurricular activities that include karate, horseback riding, swimming, game nights, movie nights.
>
> Outside of campus activities, they attend school every weekday; of course, other than the holidays.

They have great relationships with other children at the same placement. They have great relationships with the caregivers at that placement.

Milam further testified specifically that A.K. had gained a healthy amount of weight. Her bruises were gone, and her hair had begun to grow back where it was pulled out. Her teeth were whiter. She also had been given corrective lenses for her vision. Milam stated that when he first met A.K., she would seclude herself, give only one-word answers, and refuse to make eye contact. At the time of trial, however, A.K. talked to Milam in full sentences, smiled, and did not hesitate to request what she wanted.

Milam testified that the Department's plan for the children was for them to continue at their current placement while exploring the possibility of unrelated adoption. When asked if unrelated adoption meant that the children could be separated, Milam replied that the Department would conduct extensive research to make sure that the children would not have to be separated.

There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, considering all the evidence here in the light most favorable to the trial court's finding and considering the evidence as a whole, we hold that a reasonable factfinder could have formed a

firm belief or conviction that termination of Father's parental rights was in the best interest of all the children.

Moreover, as above, even if the trial court improperly considered evidence that Father pleaded guilty in December 2024 to the offenses of injury to a child, elderly, or disabled individual and abandoning a child and that he was placed on ten years' deferred adjudication for each offense, such error was harmless. *See* TEX. R. APP. P. 44.1(a)(1). Even without considering the complained-of evidence, the overwhelming evidence, as outlined above, supports the trial court's finding that the termination of Father's parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Thus, we cannot conclude that such alleged error caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *New Process Steel, L.P.*, 2006 WL 947764, at *4.

In light of the foregoing, we overrule Father's issues and affirm the trial court's order of termination.

_____
MATT JOHNSON
Chief Justice

OPINION DELIVERED and FILED:  August 14, 2025

Before Chief Justice Johnson,
      Justice Smith, and
      Justice Harris
Affirmed
CV06

